56 So.2d 905 (1951)
POINDEXTER
v.
SEABOARD AIR LINE R. CO. et al.
Supreme Court of Florida, en Banc.
October 9, 1951.
Rehearing Denied December 21, 1951.
*906 Caldwell, Parker, Foster & Wigginton, Millard F. Caldwell, Julius F. Parker, Leo L. Foster and John T. Wigginton, Tallahassee, for appellant.
Ausley, Collins & Truett, Tallahassee, for appellees.
PER CURIAM.
This is an appeal from an order granting a new trial as entered by the Circuit Court of Leon County, Florida. The trial resulted in a verdict and judgment for the plaintiff, Reid C. Poindexter, against the Seaboard Air Line Railroad Company and W.C. Rowand, the locomotive engineer. The plaintiff-appellant, about 9:00 o'clock p.m. on October 1, 1948, was driving a Cadillac automobile eastward on Highway No. 52 and crashed into a locomotive engine at the time in a stationary position at the highway crossing commonly known as Fivay Junction in Pasco County, Florida. The Cadillac car was demolished and Poindexter sustained permanent injuries. The plaintiff was hospitalized for a period of approximately sixty days as a result of the injuries sustained.
The amended declaration charged the following basic grounds of negligence: (1) the plaintiff did not see, and, under the circumstances could not have seen, the stationary locomotive then standing on the crossing; (2) the plaintiff at the time of the impact was driving in a prudent manner at a lawful rate of speed, the motor vehicle was in first class mechanical condition and under proper control; it was misting rain, the windshield wiper was in operation, lights of the car were on and the car window where plaintiff was sitting was open; (3) the defendants took no precautionary steps to warn vehicular traffic then lawfully on Highway 52 of the blocked condition of the crossing; and (4) the defendants blocked the crossing by its switching operations for an unreasonable period of time. The cause was submitted to a jury on the issues made by the amended declaration and some eleven pleas of the defendants. The pleas went to the general issue: specifically denied the allegations of negligence; and affirmatively charged that the collision was the proximate cause of plaintiff's own negligence in driving into the side of the locomotive then standing on the crossing at Fivay Junction.
The trial court set aside the verdict of the jury and granted a new trial on grounds 2, 4, 5, 6 and 8 thereof, which are viz: (2) "That plaintiff wholly failed to prove the allegations of negligence charged against the defendants in his second amended declaration. On the contrary, the proof affirmatively shows that plaintiff's own negligence was the proximate cause of the alleged accident." (4) "That the evidence offered on the part of the plaintiff affirmatively shows that but for the negligence of plaintiff the alleged accident would not have occurred." (5) "That the evidence offered upon the part of the plaintiff affirmatively shows that the sole and proximate cause of the alleged accident was the negligence of the plaintiff himself." (6) "That the verdict is contrary to the evidence." And (8) *907 "That the verdict is contrary to the law and the evidence."
It is settled law that a motion for a new trial is addressed to the sound discretion of the trial court. A stronger showing is required to reverse an order granting a new trial than one denying it. A legal presumption exists that the new trial was by the trial court properly granted. When a trial court grants a new trial upon motion which contains several grounds, then the reviewing court will be restricted to the grounds recited in the order granting the new trial. Seaver v. Stratton, 133 Fla. 183, 183 So. 335; Blue & Gray Cab Co. v. Lowe, 143 Fla. 129, 196 So. 425.
Counsel for appellees point out that as Poindexter approached the blocked crossing, the highway he was traveling was 1,300 feet straightway; the highway was flat and had a rough slag topping; there were no obstructions; no curves; no banks; no hills and no bridges. As he approached the crossing he was forced to observe three standard warning signs placed along the highway by the State Road Department: the first sign was situated 403 feet from the crossing; the second was 335 feet and the third was 29 feet. The locomotive was astride the crossing about fifteen minutes in its switching operations and eight lights were burning in the cab of the engine and the bell was ringing, the whistle had blown, and the atmospheric condition did not prevent the plaintiff-appellant from seeing the locomotive, although a light rain had been falling.
Counsel for appellees contend that the ruling of the lower court is sustained by the following authorities: Key West Electric Co. v. Albury, 91 Fla. 695, 109 So. 223; Stowers v. Atlantic Coast Line R. Co., 106 Fla. 102, 142 So. 882; Rayam v. Atlantic Coast Line R. Co., 119 Fla. 386, 161 So. 415; Kimball v. Atlantic Coast Line R. Co., 132 Fla. 235, 181 So. 533; Woods v. Atlantic Coast Line R. Co., 100 Fla. 909, 130 So. 601; Cline v. Powell, 141 Fla. 119, 192 So. 628; Denton v. Atlantic & St. Andrews Bay Ry. Co., 141 Fla. 153, 192 So. 624; Powell v. Gary, 146 Fla. 334, 200 So. 854; Brown v. Loftin, 154 Fla. 621, 18 So.2d 540, and similar cases. It is suggested that this Court could rest its ruling of affirmance exclusively on the Kimball case, supra.
Counsel for plaintiff-appellant point out that our holding in the Kimball case, and similar adjudications, is inapplicable to the facts reflected by the record in that it completely ignores and totally disregards the doctrine of the last clear chance rule as approved by the decisions of this Court, as well as the many conflicts in the evidence as reflected by the record on the exact point in controversy. The trial court, during the progress of the trial, it is argued, admitted evidence of the parties on the point at issue for the consideration of the jury and later the following instruction was given on the point or doctrine of the last clear chance rule:
"So much for the requested charges.
"I further charge you, gentlemen of the jury, the doctrine of last clear chance. When one negligently places himself in a position of peril and such perilous condition becomes known to another, that it then becomes the duty of such other to use reasonable care and caution to avoid injury to the one found in such perilous condition; it being recognized by law, however, that one being suddenly confronted with a dangerous or perilous situation is not required to exercise a greater degree of care or caution than the exigencies of the situation permit. One required to act quickly is not supposed to act with the judgment of one who can deliberate."
Testimony of Engineer Rowand:
"Mr. Wigginton:
"Q. Was your locomotive across the highway, Mr. Rowand? A. Yes, sir.
"Q. How much of the engine part of your locomotive was across the highway? A. I would say this is very close with relation to the regular road and the locomotive that night, that accident.
"Q. You would say what? A. As you have it sitting it is very much in relation to the way it was sitting that night.
"Q. Well, the toy is sitting now with your locomotive headed north on the sidetrack? A. Yes, sir.
"Q. With a portion of your locomotive north of the highway and your cab sitting *908 about in the middle of the highway and your tender immediately behind the cab, is that correct, and attached to your locomotive? A. Well, yes.
"Q. Is that approximately correct? A. Approximately.
"Q. Now, tell the jury, if you will, Mr. Rowand, if you had driven up there and stopped before you saw an automobile approaching from the west going eastward? A. Yes, sir.
"Q. Had you come to a complete stop before you saw the automobile? A. Yes, sir.
"Q. How long after you stopped did you see an automobile approaching that intersection from the west going east? A. I couldn't say exactly due to the fact that I was looking back at the brakeman give his signal and when he stopped giving a signal, then I faced westward at the time that I saw that car coming around that curve.
"Q. Then the first time you saw the car, it was coming around the curve from the west, was it? A. Yes, sir.
"Q. Do you know how far that curve is from the track? A. No, sir, only what you had to say just now.
"Q. What did you do, Mr. Rowand, when you saw the car coming? A. When I saw that car coming around that curve at that excessive rate of speed, I didn't take my eyes off that car.
"Q. How fast approximately was the car coming? A. I cannot answer that question exactly due to the fact that those headlights were coming right directly to me.
"Q. Approximately what was the speed of the car? Do you know. A. No, sir.
"Q. Well, you said it was coming at an excessive rate, did you not? A. Yes, sir.
"Q. What do you mean by `excessive rate'? A. I would say about 50 or 60 miles an hour.
"Q. As a matter of fact, the headlights were shining right at you, were they, as they came down? A. Yes, sir.
"Q. And it's difficult to judge the speed of a car as it comes toward you, is it not? A. What is the question?
"Q. It's more difficult to judge the speed of a car as it's coming directly toward you than if it's going by you? A. Yes, sir.
"Q. You say you didn't take your eyes off the car? A. No, sir.
"Q. What did the car do? A. That car kept continuously coming towards us at that excessive rate of speed.
"Q. And what happened? A. When I judged that that car was 400 or 450 feet from that engine and apparently not slowing up, there was but one thing left for me to do. I reached up, got the whistle cord, pulled that whistle wide open, and held it open until that car collided with that engine.
"Q. Now, you reached the conclusion the car was 400 or 450 feet away; that it was not slacking its speed and was not going to stop. Is that correct? A. Apparently.
"Q. Now, how long after you reached that conclusion was it that you reached up and pulled the whistle? A. I did it immediately.
"Q. Could Mr. Poindexter have stopped his car had he heard the whistle that far back? A. I would have judged so.
"Q. It's your statement, then, that he was far enough back up the road, 400 or 500 feet, that if he had put on the brakes at the time you pulled the whistle, he could have stopped? A. I judge so, yes, sir.
"Q. Mr. Rowand, do you recall talking to the highway patrolman, Corporal Blount, the night of the accident? A. He was there; yes, sir, I said something to him.
"Q. Do you recall telling Corporal Blount that you saw the car coming toward the train as you were sitting in the cab but that you assumed he would stop? Do you remember telling him that? A. No, I do not.
"Q. Do you remember telling him that the car did not stop but kept coming toward the train and that when the car got within a few feet of the locomotive, that you *909 pulled the whistle but the car was too close to stop at that time and couldn't stop? A. I don't remember making any such statement as that.
"Q. Would you say you did make it or you didn't make it?
"Mr. Collins: Your Honor, the witness has said he has no recollection of making any such statement * * *
"Mr. Wigginton:
"Q. Would you say, Mr. Rowand, you didn't make such a statement? A. I say that I didn't.
"Q. Then those facts that I just related to you are not true, are they? It's not true that he got so close, within a few feet of the train, before you pulled the whistle and that he was then so close that he couldn't stop? A. No, sir, I made no such statement as that.
"Q. Is that true or false? A. It's evidently false."

* * * * * *
"Q. You just stated in answer to Mr. Wigginton's question that there were several reasons why you didn't or couldn't get that locomotive off the highway after you saw the car approaching. You gave one of those reasons. Now, what were the other reasons that you had in mind? A. The other reason is this: Any number of times, not only on that crossing, but on any public crossing that you cross, these people will come at you, driving at a terrific rate of speed, and they will dash up and slam on the brakes, with these new automobiles, and set your nerves on edge and laugh in your face  `I made a fool out of that old bird!'
"Q. Then when you first saw the car you assumed that he would see the train blocking the highway and would stop his car? A. That's it. I thought he had ample time; that he could have seen the train and that he had ample time in eleven hundred feet to have stopped that automobile."
"A. Mr. Blount arrived on the scene shortly after the collision and talked with the engineer:
"Q. What did he say? A. He said when he first saw it, it was coming around the curve a pretty good piece down the road. It kept coming. He thought it would stop. Others had usually stopped there. He had stopped across the road before and he seen he wasn't going to stop and he reached up and pulled the whistle cord to draw his attention but it was too late.
"Q. How far did he say the car was from the tracks when he pulled the whistle cord? A. He said it was just a short piece. He didn't specify any number of feet, just a short distance from the train. He said he seen he wasn't going to stop and he reached up and blew the whistle to warn him of the fact that the train was there.
"Q. Do you recall whether or not he said that when the car got within a few feet of the train, he realized he wouldn't stop or wasn't going to stop * * *
"Mr. Ausley: We object to counsel leading the witness. Let the witness testify. A. * * * He said a few feet or just a short distance, is the remark he made, just a very close, * * * He was getting close to the train anyway."
Conductor Jones (Tr. 233) testified: "The blast and the crash was together." Witness Harrell (Tr. 336) testified that he heard the report of the crash and heard it about a couple of seconds "after the whistle started blowing." Witness Gower heard the blast of the whistle and in about twenty seconds, or more, heard the report of the impact.
In the case of Merchants' Transportation Co. v. Daniel, 109 Fla. 496, 149 So. 401, we held that the party who has the last clear opportunity of avoiding an accident, notwithstanding the negligence of his opponent, is considered solely responsible for it. Counsel for plaintiff-appellant contend that Mr. Rowand, the engineer, sat in the cabin of the engine and observed the light of plaintiff's car as he approached the blocked crossing. It is conceded that the plaintiff-appellant was negligent in failing to observe the dangers surrounding him as he approached the blocked crossing but, regardless of his negligence, the last clear chance rule made it the duty of the engineer, when he first discovered the plaintiff-appellant's perilous condition, to do all within his power to extricate him from the *910 surrounding dangers. It is contended that the engineer failed to do that which the law required of him and therefore the verdict of the jury, based on the instruction of the trial court as to the last clear chance, was proper and the trial court erred in granting the new trial.
The engineer testified: "did not take my eyes off that car"; "that car was 400 or 450 feet from the engine"; "there was but one thing left for me to do. I reached up got the whistle cord, pulled that whistle wide open and held it wide open until the car collided with the engine." The engineer told Mr. Blount: "It was coming around the curve a pretty good piece down the road. It kept coming. He thought it would stop. * * * He had stopped across the road before * * * he reached up and pulled the whistle cord to draw his attention but it was too late." (Emphasis supplied.) Conductor Jones and Mr. Harrell testified that the blast of the whistle and the noise of the impact occurred about the same time. The engineer further testified: "These people will come at you, driving at a terrific rate of speed and will dash up and slam on the brakes, with these new automobiles, and set your nerves on edge and laugh in your face * * * `I made a fool out of that old bird.'" "I thought he had ample time; that he could have seen the train and that he had ample time in eleven hundred feet to stop that automobile."
It is contended that the law, in the exercise of reasonable care, made it the duty of the engineer to immediately blast the whistle when he first observed the approach of the plaintiff at any point on the approach, either at 450 or 1100 feet from the blocked crossing, when the approach of the car was first observed by the engineer. Central of Georgia Ry. Co. v. Bates, 225 Ala. 519, 144 So. 9. The questions of what constitutes the last clear chance are disputed facts and circumstances for a jury under appropriate instructions. In Panama City Transit Co. v. Du Vernoy, 159 Fla. 890, 33 So.2d 48, 50, we said:
"The evidence gives rise to the application of the doctrine of `last clear chance,' which is a phase of the law of proximate cause, and has been stated as follows:
"`When one negligently places himself in a position of peril and such perilous condition becomes known to another, that it then becomes the duty of such other to use reasonable care and caution to avoid injury to the one found in such perilous condition, it being recognized by law, however, that one being suddenly confronted with a dangerous or perilous situation is not required to exercise a greater degree of care or caution than the exigencies of the situation permit. One required to act quickly is not supposed to act with the judgment of one who can deliberate.'
"When all of the facts and circumstances are considered, the question of negligence was a question for the jury, as there was evidence sufficient to warrant the jury in finding the defendant careless in turning its bus to the left across the path of an oncoming motorcycle. If plaintiff's-appellee's motorcycle was being driven at an excessive rate of speed, then that is a factor which the jury had a right to consider in determining whether it was the duty of the bus driver to stop and wait. It appears evident that the jury concluded that the bus turned and proceeded forward when it should have waited. Its driver had the last clear chance to avoid the accident after the motorcycle driver had placed himself in a position of peril. This he failed to do, and we must assume that the jury found he was negligent in such failure."
See Lindsay v. Thomas, 128 Fla. 293, 174 So. 418; Kenan v. Withers, 137 Fla. 561, 188 So. 95; Miami Beach Ry. Co. v. Dohme, 131 Fla. 171, 179 So. 166; Davis v. Cuesta, 146 Fla. 471, 1 So.2d 475; Ward v. City Fuel Oil Co., 147 Fla. 320, 2 So.2d 586; Williams v. Sauls, 151 Fla. 270, 9 So.2d 369; Turner v. Seegar, 151 Fla. 643, 10 So.2d 320.
It was the trial Court's view that the verdict of the jury was contrary to the weight of the evidence and the applicable law, and contrary to substantial justice. It will be observed that the trial Court correctly instructed the jury on the doctrine of the last clear chance in the substantial language of this Court as laid down in one of our recent decisions, to wit, Panama City Transit Co. v. Du Vernoy, supra. The remaining point or points in controversy were *911 the disputes and conflicts in the testimony which the jury placed at rest. It is true that the trial Court entertained views based on the evidence different from the verdict of the jury. Courts are not permitted to pit their judgment against that of a jury sworn to try the cause. It is error to grant a new trial when nothing can be accomplished except to have another jury review the cause. Seaver v. Stratton, 133 Fla. 183, 183 So. 335; Hart v. Held, 149 Fla. 33, 5 So.2d 878.
The order granting a new trial is reversed.
CHAPMAN, ADAMS, HOBSON and ROBERTS, JJ., concur.
SEBRING, C.J., and TERRELL, J., dissent.
THOMAS, J., not participating.