HENDRY, Judge.
This case comes to us with a long trial and appellate history. See: Fla. East Coast Railway Company v. Rouse, Fla.App.1965, 178 So.2d 882; Fla. East Coast Railway Company v. Rouse, Fla.1967, 194 So.2d 260. The primary issue which was reviewed in prior decisions concerned the correctness of the original trial court having submitted the case to the jury with comparative negligence instructions which were drafted in accordance with § 768.06 Fla.Stat., F.S.A. A subsequent determination of that statute’s unconstitutionality ultimately resulted in a new trial of the entire case. 194 So.2d 262.
That new trial was had in the Dade County Circuit Court, and the jury rendered its final verdict in favor of the defendant. The plaintiff, who is now the appellant, contends that error was committed in that the court declined to instruct the jury concerning the doctrine of last clear chance. It is well settled that failure to charge on last clear chance is reversible error when the facts indicate that the doctrine applies. Radtke v. Loud, Fla.App. 1957, 98 So.2d 891. Nowhere in this case’s past history have the facts been fully set forth, and this now becomes necessary, for in applying the doctrine of last clear chance,[1] a court must make reference to the specific factual situations of each case. Falnes v. Kaplan, Fla. 1958, 101 So.2d 377.
On the night of September 9, 1961, Ruby Rouse was struck by a slowly moving train owned by the appellee in the immediate vicinity of the Dania Station. According to Rouse’s own version, he was walking with his back to the train, and was struck without warning. The testimony of the train’s fireman and engineer, however, presents a completely different view.
To properly understand their account of the accident, we must first describe the setting of the accident scene. There are two parallel sets of railroad tracks concerned here, a northbound set and a southbound set. The northbound tracks lie to the east of the southbound tracks, with a distance of about five feet separating the two tracks. To the immediate west of the southbound tracks, also running parallel to both sets of tracks, is an asphalt pathway about four feet wide. The train which struck Rouse was heading north, thus traveling on the northbound tracks described above. There are, in our opinion, five instances of time relevant here, and each is set forth below in accordance with the testimony of the train’s engineer.
The first such instance occurred when the train’s engineer saw Rouse for the first time. The train was moving at about 30 m. p. h., and was located about five hundred feet from Rouse. The engineer and the fireman both observed Rouse walking naturally along the asphalt path. He was proceeding in a southerly direction, thus facing the engineer.[2]
The second important instance of time occurred as the engineer noted Rouse *634 changing his direction from southerly to southeasterly. Thus, Rouse began moving diagonally, crossing onto the southbound tracks, still facing the oncoming train.[3]
The third instance with which we are concerned occurred when the engineer felt the necessity to give Rouse extraordinary warning (i. e., over and above that which was given by the “Mars” light, a moving beam, and the fixed light, both located in the front of the engine, plus the normal noise of the train.) He did so by giving three toots on his train whistle. At that point in time, Rouse had crossed the southbound tracks and was walking within the four to five feet of space that separated the southbound tracks from the northbound tracks.[4]
The fourth important instance of time occurred after Rouse had crossed upon the northbound tracks. He was then standing in the middle of those tracks, squarely facing the train.[5]
Finally, the fifth instance relevant here occurred as the engineer, according to his testimony, saw Rouse lie down in the middle of the tracks of the oncoming train. As he observed this, the engineer then threw on the train’s emergency brakes. At this point in time, Rouse was fifteen to twenty feet in front of the train.[6] Since *635 the stopping distance of this particular freight train, with its seventy car consist (load of railroad cars) traveling at its three to four mile per hour speed was greater than twenty feet, the train ran over Rouse, severing both his legs below the knees.
At the second trial, the appellant requested the following jury instruction as to the doctrine of last clear chance:
“Even if you find from the evidence that (claimant) was in a position of danger as a result of his own negligence, you may return a verdict for (claimant) notwithstanding his negligence if (defendant) had the last clear chance to avoid injury to (claimant), that is, if the greater weight of evidence shows the existence of one of the situations which I shall now describe:
;jí íj; ifc ‡ ijs
“Third: You may find that (defendant) had the last clear chance to avoid injuring (claimant) if (defendant) knew that (claimant) was in a position of danger; if (defendant) realized or had reason to realize that (claimant) apparently would not take action to avoid the danger; and if (defendant), by the use of reasonable care, could thereafter have avoided injuring (claimant).” [Emphasis added]. Instruction Number 5.2, Florida Standard Jury Instructions.
The court refused to give the requested instruction, and the case went to the jury under the doctrine of contributory negligence.
Only one expert witness testified during the trial proceedings. This witness was Mr. McCray, called by the defendant-appel-lee. This particular witness had worked as a locomotive engineer, and, at the time of the trial, was presently the engine foreman for the Florida East Coast Railway Company. After testifying as to the dimensions of the train, tracks, location of lights, etc., the following testimony ensued on direct examination:
“Q Mr. McCray, as an engineer have you yourself operated the 500 series diesel locomotives similar to engine 571 ?
“A Yes, sir. I have operated that same locomotive.
“Q This very one ?
“A Yes, sir.
“Q Have you operated this engine when there has been a consist of that engine plus two other engines plus approximately seventy to seventy-two cars, seventy of which are loaded, and a caboose at a speed of approximately four to ten miles an hour — giving all of the speeds that have been mentioned — to twelve miles an hour and placed it in emergency application of the brakes so you can tell us what the stopping distance is as best you can approximate it? What would it be for that particular consist at those particular speeds?
“A Well, between eight and ten miles an hour placing that train in emergency position would take approximately three hundred feet to stop that train.
“Between four to six miles an hour, which would be a lesser speed, naturally the distance would reduce to approximately around 180 to 200 feet.
“Q Do all trains brake differently?
“A Yes, sir. There are none that brake — no two trains brake alike.
*636 “Q In other words the range you gave us from two hundred up to three hundred feet would be more than that?
“A That’s right.”
At the conclusion of the trial, counsel for the parties and the trial judge entered into a hearing regarding the instructions which were to be given to the jury. The judge therein rejected the appellant’s requested instructions, supra, pertaining to the doctrine of last clear chance. We hold that this was correct.
It was within the province of the trial judge to resolve, as a matter of law, that the evidence presented could not possibly justify application of the last clear chance rationale. Saucer v. Welch, Fla.App.1966, 186 So.2d 833; Gilman v. Rupert, Fla.App.1962, 145 So.2d 746. After hearing the expert testimony from the witness, McCray, the court properly concluded that there was no possible way in which the appellant could have been extricated from the situation. Even at the first point of awareness, i. e., when the train was 500 feet from the appellant, had the engineer acted by using the emergency brake, according to his testimony regarding the speed of the train at that moment, the train would nevertheless have required in excess of 500 feet to stop. If the emergency brake had been applied at the first point in time wherein the appellant was seen entering the northbound tracks, i. e., instance No. 4, supra, according to the testimony of the engineer regarding the train’s speed at that moment, the train would still have been unable to avoid hitting Rouse. Under these circumstances, it appears to us that the record clearly justified the court’s refusal to apply the last clear chance doctrine. A factual resolution of the above statistics by the jury was thereby preempted, but we think properly so. Connolly v. Steakley, Fla.1967, 197 So.2d 524; James v. Keene, Fla.1961, 133 So.2d 297; Carl v. Shick, Fla.App. 1967, 199 So.2d 283. The record indicates that the court refused to allow the plaintiff’s witnesses, the engineer and the fireman, to testify as to the stopping distance of the particular train in question. They were not competent or qualified as experts to testify in this matter whereas the defendant’s expert witness, McCray, was. The effect of this ruling by the judge was to create a conclusive resolution of fact which, for appellate purposes, must be demonstrated as clearly erroneous. Lumberman’s Mutual Ins. Co. v. Seaton, Fla.App.1968, 207 So.2d 733. The record does not show that this was done.
For the reasons stated, we hold that the last clear chance doctrine was inapplicable. Therefore, the judgment being appealed is hereby affirmed.
Affirmed.

. Prior to the case of Georgia Southern & Florida Railway Company v. Seven-Up Bottling Company of Southeast Georgia, Inc., Fla.1965, 175 So.2d 39, the doctrine of last clear chance was not applicable in railroad cases because of the existence of the comparative negligence statute, § 768.06 Fla.Stat., F.S.A. See: Seaboard Airline Railroad Company v. Martin, Fla.1952, 56 So.2d 509; Poindexter v. Seaboard Airline Railroad Company, Fla.1952, 56 So.2d 905 (both of which were overruled in Loftin v. Nolin, Fla.1956, 86 So.2d 161, 59 A.L.R.2d 1257, because of the existence of the comparative negligence statute.) However, after the decision in the Seven-Up case, supra, the doctrine of contributory negligence would now apply in railroad eases as well as auto cases. With the application of the rationale of contributory negligence, the courts may also now apply the doctrine of last clear chance as was the practice before existence of the comparative negligence statute, supra. Sanders v. Florida East Coast Railway Co., Fla.App.1968, 216 So.2d 49.

. “A He was walking towards me, facing me, walking south.
“Q The train was proceeding north?
“A North. Yes.
*634 “Q Describe what you did from the first time you saw him until the point of impact.
“A He was walking along this little place, right here [indicating], on this side of the tracks. As I was coming up here, I had my brake knocked up, and it keeps me slowing down to prepare for the man to drop off to check the bill box. As I proceeded on down, this fellow walking along there, just a natural walk, he did not seem to be in no hurry or going any place in particular, as I recall. I just was not paying particular attention to him, because you just see him.”

. “A * * * As I got closer, he started walking across from that cross place to the southbound lane tracks.
“Q He started crossing over like he was going to cross to go on to the other side?
“A I don’t know. You see them all the time walking and I did not pay much attention. As I got closer and closer, he started angling across this way [indicating], As I got a little closer, I didn’t know whether he was going to cross, or what he was going to do.”

. “Q What happened then?
“A I gave him three short toots, ‘toot, toot, toot,’ to call his attention. Maybe he was walking along there, maybe he did not see me or was- not thinking or something.
“Q At the time you gave the toots, was he facing you?
“A He was still facing, but walking on this narrow cross way. He was walking this way [indicating]. He was walking across like going diagonally across the track. I don’t know wliat he had in his mind.
“Q Where was he with relation to east and west when you gave him that series of toots on your whistle?
“A You could not say he was walking in either direction. He was walking diagonally across, kind of like southeast, northeast, diagonally. He was not walking directly east or west, north or south. He was walking more southeast.
“Q Where was he when you started tooting your whistle with relation to his position between your train and where he was on the tracks ?
“A I would say he was more between the southbound and northbound, right in between them.”

. “Q When was the first time you became conscious of some danger to this man?
“A When I saw there was danger, when the man walked right over in the middle of the northbound main-line track, and looked right straight up and over me, and then he lay down parallel in the middle of the tracks. As I seen him, I threw the train into emergency.”

. “Q Could you tell us how far he was when you threw the train into emergency?
“A You could just see him standing up over the head of your engine, down in front of you. I would say within fifteen or twenty feet in front, as far as I could see out there.”
* * ifc s}5 sjt ‡
“Q Let me ask you again. ‘Is it your best recollection, sir, that at the time you threw the emergency brake your en *635 gine was about fifteen or twenty feet from this man?’
“A Where I could see him, yes. I think I answered that.
“Q What do you mean, where you could see him?
“A When I first saw the man lay down.
“Q He was fifteen or twenty feet away?
“A I would say from looking over the front of the engine, yes, to the best of my ability.”